UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

*****************************************************************

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | |
| VS. | § | CASE NO. 3:22-cr-00465-S(3) |
| | § | |
| | § | |
| FIDENCIO GONZALES | § | |

*****************************************************************

TRANSCRIPT OF SENTENCING HEARING
HEARD BEFORE THE HONORABLE KAREN GREN SCHOLER
UNITED STATES DISTRICT JUDGE

APRIL 2, 2025

*****************************************************************

A P P E A R A N C E S:

FOR THE GOVERNMENT:

John Kull
U.S. ATTORNEY'S OFFICE
1100 Commerce Street
3rd Floor
Dallas, Texas 75242
john.kull@usdoj.gov

FOR THE DEFENDANT:

David R. Olivas
Olivas Law, PLLC
2608 Hibernia Street
Suite 209
Dallas, Texas 75204
lawyer@daveolivas.com

Official Court Reporter:

Thu Bui, CSR, RMR, CRR
1100 Commerce Street, #1654
Dallas, Texas 75242
(214) 753-2354

Proceedings recorded by mechanical stenography, transcript produced via computer.

INDEX

| | PAGE |
|---|---|
| Appearances........................... | 2 |
| Proceedings........................... | 5 |
| CHRISTOPHER HIGHT | |
| Direct 20, 26 Cross 24, 27 | |
| Adjournment........................... | 45 |
| Reporter's Certificate................ | 46 |

**P R O C E E D I N G S**

(Call to order of the court.)

THE COURT: The Court calls Criminal Action 3:22-cr-00465-S(3), United States of America versus Fidencio Gonzales for sentencing and further proceedings.

Counsel, state your appearance. Let me know if you're ready to proceed.

MR. KULL: John Kull for the Government. I'm ready.

THE COURT: Thank you.

MR. OLIVAS: David Olivas for Defense. I am ready.

THE COURT: Thank you.

I want the Defendant to please remain seated -- seated, pull the microphone up closer to you, and state your full name for the record, sir.

THE DEFENDANT: Fidencio Gonzales.

THE COURT: Mr. Gonzales, you appeared before United States Magistrate Judge Rebecca Rutherford on October 8, 2024, at which time you entered a plea of guilty to Count 4 of the Second Superseding Indictment, charging you with possession with intent to distribute a controlled substance, aiding and abetting. In violation of 21, U.S.C., Sections 841(a)(1) and (b)(1)(B) and 18, U.S.C., 2.

On that date, the magistrate judge found that your plea of guilty was a knowing and voluntary plea supported by an independent basis in fact containing each of the

essential elements of the offenses. You advised her at the time that you understood the elements of the offenses, agreed to the accuracy of the Factual Résumé, and admitted you committed all essential elements of the offenses. Accordingly, on November 4, 2024, this Court accepted your plea and adjudged you guilty of the crimes alleged in the Indictment against you. And that would be the Second Superseding Indictment against you.

The Court notes that Defendant's guilty plea was entered pursuant to a Factual Résumé, Plea Agreement, and Plea Agreement Supplement, which were reviewed and signed by both the Defendant and his attorney. I reviewed the Plea Agreement and the charges to which Defendant has pled guilty and determine that the charges adequately reflect the seriousness of Defendant's actual offense behavior so that accepting the plea agreement will not undermine the statutory purposes of sentencing or the guidelines. All relevant conduct having been taken into consideration in the calculation of the total offense level; therefore, the plea agreement is accepted and the judgment and sentence will be consistent with it.

Mr. Olivas, did you and your client timely receive a copy of the PSR and the addenda? There were a couple of them.

MR. OLIVAS: We did, Your Honor.

THE COURT: Have you had an opportunity to review those

documents with your client?

MR. OLIVAS: We have, Your Honor.

THE COURT: And are you satisfied that he understands them?

MR. OLIVAS: I am, Your Honor.

THE COURT: And at this date -- you did file objections. We talked about them briefly before this -- off the record before the sentencing got on the record and got going. I'm going to refer to ECF Document 305. It's titled, "Defendant's Out of Time Objections to Presentence Investigation Report," which the Court allowed you to file, and I accepted it.

Do you want to make an announcement with respect to any of the objections?

MR. OLIVAS: Yes, Your Honor. We're going to withdraw Objection Number 3. We find that it is not relevant.

THE COURT: Okay. And therefore the Court will not get to Objection Number 3.

The other two objections are still live?

MR. OLIVAS: Yes, Your Honor.

THE COURT: Thank you. We'll get to them in just a little bit.

Government, did you also receive the PSR and addenda?

MR. KULL: Yes, Your Honor.

THE COURT: And I note there's no objections but there were clarifications with certain supplemental information that the probation officer accepted. Did I summarize that accurately?

MR. KULL: Accepted in part. Yes, Your Honor.

THE COURT: Okay. That's right. With respect to the -- and then you filed a amended response to the PSR. There was a Government's response to the PSR which had supplemental information, and the probation officer, if I remember right, accepted some, and then you filed an amended Government's response to the PSR; is that right?

MR. KULL: Correct.

THE COURT: Okay. And so there are no objections pending at this time, correct?

MR. KULL: Correct.

THE COURT: All right. Any clarifications that we need to talk about?

MR. KULL: Not from me.

THE COURT: Okay. All right. Do you have a motion relative to the additional level of reduction for acceptance of responsibility?

MR. KULL: So moved.

THE COURT: That motion is granted. Thank you.

We'll take up the objections at this time, the ones that are left.

Mr. Olivas, the first one is your Objection Number 1 relative to PSR Paragraphs 27 and 33 relating to drug quantity calculation. You set forth in several pages the basis of your objection. The probation officer in the Second Addendum to the PSR, Presentence Report -- this was filed as ECF 308-1 -- addressed this objection and sets forth in length why the probation officer supports the Presentence Report. And so I'll take further argument or any information you want to give me on the objection at this time, this first one.

MR. OLIVAS: Very well, Your Honor.

Under the -- under my first objection, the -- he's been being charged with 21 gram -- 21.5 grams of methamphetamine. 20 of those grams were allocated to an incident that took place on November 18th. In that, he was supposed to have received 20 kilos of methamphetamine and be paid about $28,000. There is no indication other than a conversation that he may or may not have had with West, a co-defendant in this case.

We feel that, according to *Betancourt*, *Valdez*, and *Lugo*, which are both -- which are all included in my brief, the Government must have -- must have some kind of physical evidence and it can't just be uncorroborated. In *Betancourt*, it had held that uncorroborated estimates without physical estimates -- physical evidence, it cannot be supported. And we feel that based -- it will not reach to the level of

preponderance of the evidence and, therefore, should not be allowed, and we believe that his points should be reduced.

THE COURT: Okay. Anything further on this objection?

MR. OLIVAS: Not at the moment, Your Honor.

THE COURT: All right. Mr. Kull, response.

MR. KULL: Yes, Judge.

I believe the probation officer got it correct in the PSR Addendum. There's an indicia of reliability. In the PSR Addendum, we adopt those findings. There has to be evidence offered to the Court to the contrary and there's been none here. There's just argument.

THE COURT: Thank you.

With respect to making factual findings for sentencing purposes, a district court may consider any information which bears sufficient indicia of reliability to support its probable accuracy. And, generally, a PSR and its addenda bears sufficient indicia of reliability, considered as evidence by me in making factual determinations. I do find the PSR in this case to be sufficiently reliable and therefore the Defendant now bears the burden of showing the information in the PSR is materially untrue, inaccurate, or unreliable.

I can adopt the facts contained in the PSR without further inquiry if, quote, "The defendant does not present rebuttal evidence or otherwise demonstrate that the information in the PSR is unreliable." Mere objections to the

PSR do not suffice as competent rebuttal evidence. Further, the case law the Defendant cites in support does not really support the Defendant's argument.

Just quickly, the *Lugo-Orosco* makes no mention of drug quantity calculations. And the citation of *Betancourt* is similarly unpersuasive. The Defendant cites *Betancourt* for the proposition that drug quantity estimate is based solely on interpreted [sic] conversations and new informant's statements without physical corroboration can't support guideline enhancements; however, the cases inapposite does not support this argument because the court held the district court did not err in relying on the defendant's statement to co-defendant about supplying cocaine to calculate the total amount of cocaine defendant was responsible for. That's a Fifth Circuit case.

I also adopt and incorporate all the reasons set forth, supporting the position on drug quantity by the probation officer as sets forth in detail in the Second Addendum.

So in summary, I find that there is sufficient evidence basis for the drug quantity calculation as explained in the PSR and Second Addendum. And accordingly, for all these reasons, I overrule the first objection.

Let's turn to -- to the Defendant's second objection which relates to PSR Paragraph 35, the premises

enhancement. This is a two-level enhancement.

Mr. Olivas, go ahead.

MR. OLIVAS: Yes, Your Honor. The similar -- let me try that again.

It is a two-point enhancement saying that my client maintained a premises for his drug -- his drug enterprise. We are arguing that that is not the case. He -- regarding the hotel, that was West's hotel. He was not -- he did not have -- he did not pay rent. He did not pay utilities. This was not his household. There was not his expense. He was there with his --

THE COURT: But he rented the hotel room, right? I mean, he paid for the hotel room. I mean, he doesn't own the hotel.

MR. OLIVAS: That is true. He doesn't own the hotel.

THE COURT: There's a lot of instances where drug transactions take place in a hotel and rooms that are -- I wouldn't call them rented out. But what do you call it when you have a -- you pay for the hotel room. And you're not disputing that happened, are you?

MR. OLIVAS: I am not, Your Honor.

THE COURT: Okay. All right. But keep going. I just wanted to make clear.

MR. OLIVAS: Okay. We find that other than the observations that were taken place, it actually didn't show

that he was dealing in drugs. They showed him moving barrel -- moving boxes or perhaps a pail in other cases. Many of the incidents listed in the PSR were actually not attributed to him and were just used to show he may have been involved in -- or he was involved in drug activity.

We feel that this two-point enhancement is overbearing, and we feel that he did not maintain a residence as required by the law, Your Honor.

THE COURT: Thank you, Counsel.

Mr. Kull.

MR. KULL: I echo the same thing I said with Objection 1, Your Honor.

THE COURT: Which is essentially you're relying on the PSR?

MR. KULL: Yes, Your Honor.

THE COURT: And the Addendum?

MR. KULL: Specifically, I'm relying on the findings by the probation officer in Document 308, which is in response to Defendant's objection regarding maintaining a drug premises. I believe there's sufficient basis as contained in Document 308, Subsection 2 as addressed by the probation officer for indicia of reliability as to the findings by the probation officer. There have been no evidence offered in contrary, so therefore we believe we have prevailed on the maintaining a drug premises.

THE COURT: Okay. Thank you.

I'm in agreement with the Government. Again, not to reiterate the standards. I do find sufficient indicia of reliability support its probable accuracy of the PSR and the addenda and, therefore, the burden switches to -- of this enhancement switches to the Defendant showing the information is materially untrue, inaccurate, or unreliable. Again, a mere objection to the PSR does not suffice as competent rebuttal evidence. And I agree with the probation officer's response to the objection to Paragraph 35, that the Defendant is accountable for the hotel room he used to distribute drugs to at least one other defendant.

The Factual Résumé from this Defendant describes a surveillance and intercepted telephone conversations connected to the defendant -- to this defendant to drug related activities in the hotel room. And as stated in the Second Addendum -- I think it's the Second Addendum -- yes, Second Addendum by the probation officer, after West was arrested, the Defendant stated he would find another hotel room and pick up methamphetamine to deliver to another customer, as described in Paragraph 23 of the Presentence Investigation Report.

Under Sentencing Guideline 2D1.1, comment -- Note 17, I find the Defendant did use the hotel room primarily to distribute drugs to at least one other defendant and his

residence to store drugs for further distribution. Therefore, the objection to the enhancement for maintaining a premises is overruled.

Have I taken care of all your objections?

MR. OLIVAS: You have, Your Honor.

THE COURT: Thank you.

There being no further objections, the Court adopts as its final findings of fact, the statement and guideline applications in the Presentence Investigation Report and the addenda subject to any findings that I might make during this hearing.

The current guideline range is as follows: Total Offense Level 37; Criminal History Category 6; imprisonment range, 360 to 480 months; supervised release range, four to five years; fine range, $40,000 to $5 million; plus cost of imprisonment and supervision.

Mr. Olivas, at this time I'm going to turn to you to make any remarks that you feel are appropriate on behalf of the Defendant. Of course, the law allows him to allocute if he chooses. And so the presentation of whatever you want to speak to me about regarding his sentence, I'm going to turn over to you now. Please go ahead.

MR. OLIVAS: Very well, Your Honor.

Your Honor, Mr. Gonzales, I'm not going to apologize for anything that he has done in the past. You've

seen his history. He has a very extensive history.

I do believe that men are able to change, and I believe that Mr. Gonzales has changed. Earlier this -- or last year, he helped with an investigation of a runaway. In doing so, his co-defendants believed that he was snitching. They believed he knew that -- they knew that he was getting out of Tango Blast and they jumped him. This was an incident that took place. He was stabbed. He was hit in the head with weapons and pretty much left for dead. He is in real fear of being -- of being sent to prison with fellow gang members of which he is a part -- or was formerly a part.

I feel that though he may have committed these crimes, 360 months is a very long time, Your Honor. It is a very long time. I feel that the lesson will get across at the very minimum.

Additionally, the three other co-defendants, Michael Ponce, Hugo Garcia, and Ever Garcia, each got 130 months respectively for their roles in the same conspiracy. We feel that if these three individuals who had about the similar role as Mr. Gonzales were sentenced at 130, he should be sentenced at the lower end of his range as well.

THE COURT: All right. Just so it's very clear. It's 102 months -- 32 months. And each of those defendants that you're naming had a Criminal History Category 1 and other differences, so... Every defendant that appears before me, you

know, I try to make sure I'm consistent, but comparing to those three is a bit of apples and oranges here. But thanks for pointing it out. I just wanted to make sure you knew that I'm being very careful about disparity among defendants. Okay?

MR. OLIVAS: Very well, Your Honor.

THE COURT: All right. But please continue --

MR. OLIVAS: Thank you, Your Honor.

THE COURT: -- Counsel.

MR. OLIVAS: I feel that he will be able to address exactly how he's feeling better in his own words. And I believe that when the Court is ready, he will allocute.

THE COURT: Okay. All right. Is now the time for, Counsel, for the allocution?

MR. OLIVAS: Yes, Your Honor.

THE COURT: Okay. Mr. Gonzales, the law allows you to speak on your own behalf and present to me any information that you want to tell me in mitigation of your sentence. This is voluntary. You don't have to do so but if you want to, go ahead.

THE DEFENDANT: Yes. I would like to thank my family for being here.

THE COURT: Yes. I see that you have a bunch of ladies here to support you. Did you see them?

THE DEFENDANT: Yes, ma'am.

THE COURT: Okay.

THE DEFENDANT: Second, I would like to apologize to the Government. I never tried to put nobody's in harm's way.

Third, I would like to ask the Court for leniency. I know I've been in a lot of trouble all my life. That's all I know. I grew up in a bad neighborhood, Judge. South Dallas is the roughest neighborhood in Dallas. That's all I know. But sending me for prison for the rest of my life is not going to help me.

I did get stabbed. I did get hit. I was sent to a hospital for something that I didn't even do. I got accused of snitching or debriefing on somebody that I didn't even do.

He got my medical records. He seen they sent me to the hospital. I was badly beaten for something I didn't even do. I'm trying to do the right thing. I'm trying to change.

I have an IQ of 67. I can't even read or write, Judge. The PSI lady lied on me, saying that I -- she called my boss and -- yeah, she called my boss but she gave him the wrong name at my job. I mean, do they -- did they do their work right, their job right? I don't know. Did she go to my school and find out that I was in special education all my life? I don't know. She didn't talk about that.

Find it in your heart, Judge, to give me one more chance and let me prove you wrong. You won't see -- you

won't see my face in your court anymore. And forgive me for being lost. That's it.

THE COURT: Thank you, sir.

Mr. Olivas, anything further on behalf of your client?

MR. OLIVAS: Not at the moment, Your Honor.

THE COURT: Thank you.

Government wish to be heard?

MR. KULL: Yes, Your Honor. We have testimony from Task Force Officer Hight who is one of the lead agents on this case regarding the shooting that occurred of Hylas Polk, as referenced in Paragraph 44. May I call him? I'm sorry. I didn't mean to --

THE COURT: Oh, okay. You're going to present evidence to the Court?

MR. KULL: I am.

THE COURT: Okay. Call your witness.

MR. KULL: Chris Hight.

THE COURT: All right. Officer Hight, please take the stand. I swore you in earlier, but I'm going to swear you in again just so it stands alone on this record.

(Whereupon, the oath was administered by the Court.)

THE COURT: And, Mr. Kull, even though we've had this officer on the stand earlier today, this record needs to stand on its own, so if you'll just ask the background questions and

anything else you feel is appropriate so it's readily apparent from this record, the evidence, and who this officer is, please.

MR. KULL: Yes, Your Honor. May I proceed?

THE COURT: You may.

(WHEREUPON, **CHRISTOPHER HIGHT** was called as a witness, and having been duly sworn, testified as follows:)

DIRECT EXAMINATION

BY MR. KULL:

Q. State your name.

A. Christopher Hight.

Q. How are you employed?

A. As a Dallas police officer.

Q. For how long?

A. 35 years.

Q. Do you work at any other agency?

A. Yes. I'm assigned to the DEA task force.

Q. For how long?

A. 20 years.

Q. And what do you do on a daily basis as both a Dallas Police Department officer as well as a T -- TFO for the DEA?

A. I investigate drug trafficking offenses.

Q. Are you familiar with the defendants who are indicted in the case style United States of America versus Francisco Puente, et al.?

A. Yes.
Q. Is one of those individuals Defendant Fidencio Gonzales a/k/a Chencho?
A. Yes.
Q. Did that investigation include a wiretap over the Defendant's phone?
A. Yes.
Q. And did we learn anything about the Defendant with regard to a shooting that had occurred on November 21st, 2022, as outlined in PSR Paragraph 44?
Now, I know I haven't shared the PSR with you, but Paragraph 44 references the shooting. Are you familiar with the facts regarding that shooting?
A. Yes.
Q. And are those facts based on interceptions that you had of the Defendant as well as others in this situation?
A. Yes.
Q. Please describe for the Court what occurred based on wiretap interviews, wiretap interceptions that we have regarding the Defendant and others on November 21st of 2022.
A. Okay. In the early afternoon, we began intercepting phone calls that revealed that Fidencio was engaged in some kind of a dispute over a vehicle. The dispute was with an individual they referred to as Red. He began calling some of his associates to report to the location, to bring weapons with

them.

Whenever everyone arrived -- well, actually before that, he received a -- there was about an hour delay from the time the calls began until the shooting occurred. He received one call from an unknown male telling him that he knew of a Glock that he could purchase for $375. Fidencio asked him what he needed to do. The unidentified male said, "Pull up and buy it." He said, "I'm on my way," and then he said, "I'm almost there."

Later on, we intercepted calls where Fidencio told a number of people that he had just gotten into a shooting, involved in a shooting with some of his people -- Red and some of Red's people. He told multiple people that he shot Red in the side during the -- the gunfight.

Q. With regard to the individuals who showed up, approximately how many others showed up just based on the intercepted phone calls can we tell?

A. The best I could tell, anywhere from four to six.

Q. Now, based on those same phone calls, do we believe there was a relationship between the Defendant and Red prior to the car dispute?

A. Yes.

Q. And what was that?

A. Red was his drug customer.

Q. And how do we know that?

A. There were intercepted calls where the day before Fidencio had delivered at least one kilo of meth to Red, and then Fidencio also made statements after the shooting to multiple people that Red owed him for three kilos of meth.

Q. And you're not --

MR. KULL: For record purposes, for defense -- for defense counsel and for the Judge, the one kilogram delivery, as referenced by Task Force Officer Hight, is referenced in Paragraph 23.

Q. How much did Red owe the Defendant?

A. According to Fidencio, it was anywhere from 9,000 to 12,000. He -- he made three different statements.

Q. And these are multiple persons?

A. Yes.

Q. And what was -- after the -- after the shooting, what is consistent about the Defendant's role in that shooting to multiple parties?

A. That he shot Red.

Q. Now, after the shooting, where did the Defendant go, based on his phone calls?

A. He went somewhere out in West Texas.

Q. Does he -- does he ask others to do anything for him before he flees town?

A. Yes. He asked one individual to clean out his motel room, and then he asked another individual to distribute eight or

nine ounces of meth on his behalf.
Q. Now, with regard -- there's a final conversation that was intercepted with somebody who identified themselves as Kat, K-a-t.
A. Yes.
Q. Or at least that's the way the monitor spelled it.
Are you familiar with that call?
A. Yes.
Q. Okay. Is there any discussion about seeking payment from Red if he lives?
A. Yes. He said that he had people that he was -- he could send and he would collect the money either way.
Q. Okay. Now, in the phone conversations, it is clear that the Defendant is hopeful that Red somehow survives?
A. Yes. He made a statement.
Q. And why does he -- why does he want him to survive?
A. Because Red owed him money.
MR. KULL: Okay. That's all I have, Judge.
THE COURT: Thank you.
MR. KULL: With regard to that paragraph.
THE COURT: Okay. Cross-examination.
MR. OLIVAS: Very well, Your Honor.

CROSS-EXAMINATION

BY MR. OLIVAS:
Q. How are you doing, Mr. Hight?

A. Doing well.
Q. So Mr. Gonzales's involvement in shooting someone would be considered a crime; wouldn't you agree?
A. Yes.
Q. And in order to get a crime, you'd need probable cause to arrest; is that correct?
A. Yes.
Q. Did you have probable cause to arrest in this case?
A. For the shooting?
Q. Yes.
A. I didn't.
Q. You did not.
Was there --
A. The --
Q. That's good.
A. Okay.
Q. You did not have probable cause to arrest; is that correct? That's what you answered to?
A. Well, as a state police officer, possible. I didn't even consider that, given that Dallas PD had jurisdiction and homicide detectives were working or -- yeah, CAPERS' detectives were working the shooting. That wasn't within my role.
Q. Okay. Was a -- was this case ever presented to the grand jury?
A. I don't believe so.

Q. Okay. Nothing was ever done on this case; is that correct?
A. Not to my knowledge.
Q. Okay. But this is --
A. Other than the investigation.
Q. There's absolutely enough probable cause, but it was -- nothing was ever done; is that correct?
A. As far as I know, yes.
Q. No charges were ever filed?
A. That's correct.
Q. And -- and matter of fact, if they wanted to, they could have; is that correct?
A. I believe so.
Q. Okay.
MR. OLIVAS: No further questions, Your Honor.
THE COURT: Thank you. Any redirect?
MR. KULL: Just briefly.

REDIRECT EXAMINATION

BY MR. KULL:
Q. The victim -- what is your understanding of the victim's willingness to cooperate with the underlying aggravated assault against him?
A. That he would not cooperate.
Q. And is the -- based on our last contact -- or your office's last contact with the lead CAPERS' detective -- CAPERS

stands for crimes against persons -- detective, where is -- is Hylas Polk able to walk?

A. My understanding is that he's still confined to a wheelchair.

Q. And so according to what you understand about that detective that the defense counsel is asking you about, Mr. Polk wasn't willing to pursue those charges?

A. That's correct.

Q. But was there an innocent juvenile boy that was also shot in the thigh down the street?

A. Yes.

Q. Okay.

MR. KULL: That's all I have, Judge.

THE COURT: Thank you.

Any recross?

MR. OLIVAS: Yes, Your Honor.

THE COURT: Go ahead.

RECROSS-EXAMINATION

BY MR. OLIVAS:

Q. There's videos involved in this case, isn't there?

A. Videos of the shooting?

Q. Of -- of the incidents.

A. Of the shooting?

Q. Yes.

A. I'm not aware of them.

Q. It's -- and even though there was a innocent injured in this case, there's no indication that this was my client who did it; is that correct?
A. Not that I know of.
Q. And there were other people involved in this case, weren't they?
A. Yes.
Q. Okay. With guns, correct?
A. Yes.
MR. OLIVAS: No further questions.
THE COURT: Thank you.
Anything else with this witness, Mr. Kull?
MR. KULL: No, Your Honor.
THE COURT: All right. I'm assuming you're not going to call Officer Hight up again. Can he step down?
MR. KULL: I don't believe I'm going to need to call him again.
THE COURT: Okay. Step down and take a seat in the gallery.
Go ahead, Mr. Kull.
MR. KULL: In my presentation today --
THE COURT: And in your presentation -- the guideline range you know what it is, 360 to 480. And before you sit down, I'd like to know where in the guideline range the Government -- what your position is.

MR. KULL: 480.

THE COURT: Okay.

MR. KULL: In my presentation today I will be referencing -- maybe not by the exact name, but several of the 3553(a) factors. The number one priority based on this Defendant's PSR would be to promote respect for the law. To a very high priority for the Government also would be to protect the others -- to protect others in the community. And then, three, because it appears, based on this PSR, the Defendant has had multiple opportunities to get his life straight. And I recognize he allocuted and said he was bound in -- born in South Oak Cliff, but there are numerous people who have been born in South Oak Cliff who have not evolved into a life of crime as has this Defendant. So we would note for the Court that adequate deterrence would be a -- another issue.

So what we've learned from the shooting, Judge -- what's very interesting is after the shooting, after he has shot one of his customers that owes him for three bricks of methamphetamine ranging anywhere between 12,000 and 9,000, he hopes he survives not so he hopes he survives, but so he can get paid the monies owed.

Not only that, in fleeing the scene of the shooting -- it started -- it started over a car, but there's several references, as noted by Task Force Officer Hight, that he was a customer and that he had owed him for drug proceeds.

So the Defendant got extremely lucky that he was not charged with an additional six points for use of the weapon in furtherance of a additional felony. That's because the car dispute at least started over -- the dispute at least started over a car, but quickly devolved when the Defendant called multiple parties to come assist him in the firing of the weapons happened.

And I don't -- maybe Mr. Olivas knows better than I do, but I don't know what gun was the one that shot and hit the kid down the block, but it really doesn't matter because the Defendant went and -- he's -- he's at the scene. He goes and buys a Glock and comes back to the scene. And he admits multiple times that he's the one that shoots Hylas Polk and eventually, as we know now, leaves him in a wheelchair. But I guess good news for the Defendant is that his drug -- his drug customer doesn't want to prosecute, so he's only left with this federal case.

So let's talk about the federal case, Judge. We see in Paragraph 25, just a mere two weeks after this shooting has taken place, the Defendant has been caught with -- or over the wire intercept with 21.5 kilograms of methamphetamine. He is still dealing drugs. Even the shooting of one of his customers doesn't dissuade this Defendant from further drug dealing.

We see in Paragraph 30 -- and the probation

officer didn't make him lose his acceptance of responsibility. But he is involved in a jail incident, which not many people are. You would think looking at his fifth felony here before the court, he would be on his best behavior. That was not this Defendant.

We also see in Paragraph 81 he's been a member of Tango Blast since 2009.

Now, his criminal history, Judge. The Defendant has been given numerous opportunities to correct his behavior. We see in Paragraph 48, there's a family violence assault which is a felony that gets reduced down to a misdemeanor.

During that, somebody by the name of Rosanna Gonzales, a family and household member, he struck and pulled her with his hand and kicking her with his foot. The felony was reduced to a misdemeanor. And he was given a great opportunity. It was a deferred adjudication. Of course, the Court may or may not know that a deferred adjudication isn't a conviction on the Defendant's record; in fact, it's just the opposite. If he successfully complete your deferred adjudication, that goes away.

Now, that -- that assault, it occurred at the age of 20. It was after the Defendant's first contact with law enforcement when he fondled the victim's vagina with his hand from behind while she stood outside a classroom that at the age

of 13 where the Defendant was given one year probation. Now, there is something to be said about that one year probation 'cause that's the only probation he successfully completes.

We know from Paragraph 48, just four months into his deferred adjudication for that family violence assault, he is revoked. It looks like he used marijuana, cocaine, failing to perform community service hours and failing to report for assessment and treatment services. So whatever he -- the court had ordered him to do, he just didn't do it. Got revoked. His probation was revoked to 90 days in a county jail.

Now, what it -- and he was revoked on February 18th of 2005. His next offense in the PSR in Paragraph 49 is shortly thereafter on June 23rd, 2005. He commits a burglary of a habitation.

Now, let's keep in mind that he just been at this state offense and he'd been given the deferred adjudication to complete. He gets his first felony, and his state probation officer gives him another chance by giving him probation. This time, it's four years imprisonment probated for six years.

THE COURT: And this is Paragraph 49, right?

MR. KULL: Yes, Your Honor.

THE COURT: Okay. I'm following you.

MR. KULL: A mere 18 months after he was placed on that

felony probation, he is revoked and sentenced to three years of imprisonment. So even though it was four years in jail, probated for six years, he got an additional break because he wasn't sentenced to four years. He was only sentenced to three years. So for some reason, the prosecutor knocked off a year and gave him three years TDC. That was his first felony.

Now, he was revoked again because he couldn't stay away from marijuana and cocaine. And this time on the felony probation, we see a new drug introduced. He's using methamphetamine. Once again, he failed to do simple things, like to complete community service hours. And not to mention, while he was on this first felony probation, he committed numerous new offenses, as referenced in PSR Paragraph 49, of burglary of a vehicle, discharging a firearm, unlawful carrying a firearm, failure to identify, and unlawful possession of a firearm. All on May 24th, 2008. And, again, like we found out with the misdemeanor probation, he failed to submit to alcohol and/or substance abuse evaluation.

Now, what's interesting about that is in Paragraph 49, he's clearly arrested but he's, apparently, given bond. And I say that because he commits another offense while he appears to be on bond in Paragraph 50. He commits a theft of property offense. There's a DWLS, which I'm not going to jump up and down. I mean, everybody drives without their license, I guess, these days. That's not that big of a deal.

What is interesting about that, driving without license -- or his license is invalid, Judge. If you read the facts about that particular case, he fled from border patrol on foot, attempted to jump a fence while the Eagle Pass police officer pursued on foot. The Defendant got stuck in the barbed wire fence and refused to come down from the fence. They had to deploy OC spray. He gets charged for evading arrest on that as well.

We have a discharging of a firearm. This time, the state probation officer -- the state prosecutors decided he'd had several chances to probation and they just sentenced him straight to 90 days in jail on three separate charges, the discharging of the firearm. And, of course, the facts of that are listed under Paragraph 52. The fail to ID a fugitive out of the same occurrence. The unlawful carrying of a weapon out of the same occurrence. And they gave him 90 days for all those. And keep in mind, that's when he was on felony probation. So those are all misdemeanors.

So then -- it's hard to tell from the PSR, but he appears to be on bond when he commits his second felony based on the date 12-14-2007. He gets another deferred adjudication, which this time it's a felony. They didn't reduce it, but they gave him five years of deferred adjudication to successfully complete. And not very long after he was placed on that, his probation gets revoked.

Now, the probation -- the motion to revoke again, includes, once again, testing -- or he admitted using cocaine, testing positive for cocaine and marijuana. Simply failing to report to the probation officer. He traveled outside of Dallas without permission and failed to complete community service hours, failed to complete antitheft class, and failed to complete an intensive outpatient substance counseling program.

At some point in there, it looks like he, again, is on bond for that felony offense. And they gave him five deferred when he commits the offense of burglary of a motor vehicle on 5-26-2008. The same -- for Paragraph 57.

Now, on Paragraph 58 -- this will be Felony Number 3 -- he pled guilty and got five years deferred as he had in the prior felony. So despite being out on bond committing other offenses, the state prosecutor's office gives him five deferred on September 24th of 2008. We see that shortly thereafter, within a year -- it looks like maybe two years into that five years deferred adjudication, he is revoked and given nine months of imprisonment.

We also see from the theft of person, there was -- this is not just a steal and grab type deal. We see from the facts that during this offense, the victim experienced pain, swelling, lacerations on his face and was treated at the hospital as a result of this offense.

Paragraph 59, aggravated assault with a deadly weapon. This occurs what appears to be eight months after his release for the prior deferred that he was revoked. He was released on February 11th of 2013. Then on October 16th of 2013 -- so within the same year, eight months later, he commits an aggravated assault with a deadly weapon.

The Defendant threatened to kill the victim while holding a machete. Wisely, the state prosecutors didn't give him probation on that case. He got three years to do. He was given three years to do on April 23rd of 2014. A little over two years later, he's released. And on October 14th of 2016, he's released and he is discharged the next day.

Within three years after the release for the aggravated assault with a deadly weapon where that victim -- I forgot to mention -- suffered bruising, pain, and swelling to her back. Her back, right arm, forehead, and neck.

Less than three years later, he commits another aggravated assault with a deadly weapon. With a victim he had dated for 18 months. The victim departed in her vehicle and the Defendant chased her -- another her -- in his vehicle, striking the victim's vehicle with his vehicle four times. The Defendant grabbed the individual by the arm to pull her away from another individual, placed her in a bear hug. And one of the witnesses observed the Defendant holding a handgun in his hand, which he tucked into his waistline at the small of his

back.

So this -- this time, this is going to be, what, a five-time convicted felon engaged in yet more nefarious activity with another -- against another female in which he had a weapon.

Well, you would think after his second aggravated assault case, that would be enough to deter the Defendant, but it wasn't because we see after -- within four months after his release from prison on that aggravated assault weapon -- aggravated assault with a deadly weapon case, based on the dates, he's released on July 19th of 2020, and then on November 8th of 2020 resisting an officer. And this was in Louisiana. It looks like he had marijuana in the car, too. Four months after his release from prison. And Louisiana -- to their credit, Louisiana prosecutors didn't give him another probation. They gave him 30 days in jail.

Paragraph 62 we have an evading arrest. Another felony. This is will be Felony Number 6. So if we're to believe this, Judge, he pled guilty to Count 1, sentenced to 30 days in jail on February 4th of 2021, according to Paragraph 61. Well then, he's clearly out. So either they let him out early, he had back time, something, because he's back in Dallas County on February 25th of 2021, 21 days later, and commits Felony Number 6.

Now, again, he's given the minimum, which will

be two years imprisonment. He's paroled on January 3rd of 2022. And on November 11th, so less than a year later, he is engaged in my narcotic trafficking for Felony Number 7 when he's intercepted over the phone on the overt act as alleged in Paragraph 11.

So, Judge, the Defendant has been given multiple opportunities, both by the state prosecutors from his very -- well, not the lewdness, not the grabbing of the vagina when he was 13, but the next offense that he had when he's given deferred adjudication. And he just doesn't comply with what the court says and he continues to commit more offenses and now he sits before you either a six- or seven-time convicted felon. And yet again on the day that Hylas Polk was shot and submitted for the rest of his life, apparently, to a wheelchair, the Defendant, all he had to do was walk away. Get payment some other way. But that's -- that's just not this Defendant, Judge.

And so I don't know -- the Government doesn't understand how the Court could go anything less than 480 based on this criminal conduct, the number of violent offenses he's occurred, the number of opportunities to correct his opportunity that he has been given, and the number of violent offenses, both charged and not charged, with which this Defendant has committed in our community.

THE COURT: Thank you, Counsel.

Anything further?

MR. OLIVAS: Your Honor, I ask that the Court disregard regarding -- information regarding the shooting as it is unadjudicated. I feel it is a violation of his Fifth Amendment rights. And I find that any information gleaned from that, from the detective and from this, should be stricken as it is a violation of his due process rights. He was never tried. He was never indicted, which means it didn't even raise to the level of probable cause. As such, it should not raise to the level of preponderance of evidence in this hearing, Your Honor.

THE COURT: Thank you.

MR. KULL: Your Honor, I apologize.

THE COURT: Go ahead.

MR. KULL: I forgot what Mr. Olivas had said earlier regarding the Defendant attempting to locate the missing child. If the Court is going to consider that -- it's my fault. I just recognize this now that I see it before Task Force Officer Hight -- I would like -- if the Court is going to consider that --

THE COURT: Consider what? I don't -- I'm confused.

MR. KULL: Defense counsel's argument that he attempted to --

Help locate a fugitive?

MR. OLIVAS: Help locate a runaway girl.

MR. KULL: A runaway girl. If the Court is going to

consider that, I have -- I have to give -- proffer something to the Court or call back testimony from Officer Hight.

THE COURT: I'm considering everything that's presented to the Court.

MR. OLIVAS: We're going to withdraw, Your Honor.

THE COURT: Pardon?

MR. OLIVAS: We're going to withdraw.

THE COURT: Okay. Anything further, Mr. Kull?

MR. KULL: No, Your Honor.

THE COURT: Or Mr. Olivas?

MR. OLIVAS: No, Your Honor.

THE COURT: I will now state the full sentence determined after consideration of all the factors set out in Title 18, U.S.C., Section 3553(a), including especially the advisory sentencing guidelines issued by the Sentencing Commission and the conduct admitted by the Defendant in his Factual Résumé.

It is the judgment of the Court the Defendant Fidencio Gonzales in 3:22-cr-00465-S(2) [sic] is hereby committed to the custody of the Federal Bureau of Prisons for a period of 420 months. This sentence shall run consecutively to any future sentence which may be imposed in Case Number F-2170039 in the Dallas County Criminal Court 1 in Dallas, Texas, which is pending -- a pending parole revocation.

I did not order a fine or community restitution

because the Defendant does not have the financial resources or future earning capacity to pay a fine.

It is ordered that upon release from imprisonment, Defendant shall be placed on supervised release for a term of five years.

The Court adopts the terms of supervision set forth in Miscellaneous Order Number 64 and outlined in Part G of the Presentence Investigation Report, except as may be modified by any facts set forth in any addenda. The Defendant shall comply with these conditions during the term of supervision.

It is further ordered the defendant shall pay a special assessment in the amount of $100.

In determining the sentence, I considered the advisory guidelines as well as the other statutory directives listed in 18, U.S.C., Section 3553(a). A sentence of 420 months is sufficient but not greater than necessary to comply with the purposes set forth in Paragraph 2 of 3553(a), which is: Reflect the seriousness of and provide just punishment for the offense, promote respect for the law, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the Defendant.

On that last point, I do agree with the Government that protection from the public and the multiple and extensive criminal history that goes on for many pages from --

I'm really not going to look at the -- or consider the juvenile adjudication in Paragraph 47. But if you take that out, it goes on for a couple of dozen paragraphs, from Paragraph 48 through 72, and many instances of very violent conduct.

So because the difference between the maximum and minimum is -- guideline range exceeds 24 months, I have to state the reasons. And I'm considering the nature and circumstances of the offense, his particular role in this offense. History and characteristics of the defendant, he's a Criminal History 6. He has gang affiliation, and he's an extremely violent offender, as well as the other 3553(a) factors.

I have now stated the sentence and the reasons for the sentence. Are there any objections or reason why the sentence should not be imposed as stated? On behalf of the Government?

MR. KULL: No, Judge.

THE COURT: On behalf of the Defendant?

MR. OLIVAS: No, Your Honor.

THE COURT: And I will -- since you brought it up, Mr. Olivas -- say that this would be the sentence even if the Government had not brought up and stated in the probation officer's PSR addenda the -- what I will call generically the shooting incident. This is in -- these are for the other reasons that I mentioned here in this hearing, and that

shooting incident is consistent with that. But it's not something that would have changed -- disregard for that would not have changed the sentence in light of the Defendant's history.

The sentence shall be imposed as stated.

For the record, as I said, even if the guideline range was not calculated or applied correctly, the Court states it would have imposed the same sentence for the reasons I gave during the sentencing hearing regardless of the applicable guideline range.

Mr. Kull, can you specifically state the dismissed counts? Your motion, please.

MR. KULL: Yes, Your Honor. One second, please.

Your Honor, the Government moves to dismiss as to this Defendant only the Original Indictment. It looks like on December 6th of 2020, although I'm having a hard time reading the file stamp. The second -- the Superseding Indictment, all counts against this Defendant. It was filed on February 22nd of 2023 at 4:00 p.m. And as to the Second Superseding Indictment, the Defendant having pled guilty to Count 4, the Government will move to dismiss, at this time, Count 1 and Count 6.

THE COURT: That motion is granted.

Mr. Gonzales, you waived your right to appeal your sentence and to complain of it in a collateral proceeding;

however, you have reserved from that waiver the right to complain of any errors or arithmetic that the Court may have made in the calculation of your total offense level or your criminal history category, the right to challenge the voluntariness of your plea of guilty and/or your waiver of appellate rights, and the right to complain of any ineffective assistance of counsel.

If you decide to appeal on any ground, you have the right to apply for leave to appeal in forma pauperis if you're unable to pay the cost of an appeal. And if you decide to appeal, you must do so within 14 days in writing and file it with the Court, and your attorney will assist you in that if you ask him to.

Is there anything further on behalf of the Defendant?

Well, let's start with the Government since you're standing up. Mr. Kull?

MR. KULL: I'm sorry.

THE COURT: Anything further?

MR. KULL: No, Judge.

THE COURT: Mr. Olivas?

MR. OLIVAS: No, Your Honor.

THE COURT: Probation, have I covered it?

PROBATION OFFICER: Yes, Your Honor.

MR. OLIVAS: I did have one other thing.

THE COURT: Yes, sir.

MR. OLIVAS: I do know that he had asked to be at Three Rivers placement. That's the only placement --

THE COURT: Where is Three Rivers?

MR. OLIVAS: Where is Three Rivers?

Near -- near or around San Antonio area.

THE COURT: Why?

THE DEFENDANT: I have kids there.

THE COURT: Okay. The Court will consider making a nonbinding recommendation to the Bureau of Prisons that the Defendant be placed in Three Rivers or as close to the San Antonio area due to family. Does that work?

Okay. And is there anything further on behalf of the Defendant?

MR. OLIVAS: No, Your Honor.

THE COURT: Okay. At this time I'm remanding the Defendant to the custody of the United States Marshals.

And we are adjourned.

SECURITY OFFICER: All rise.

(WHEREUPON, the proceedings were adjourned.)

* * * *

REPORTER'S CERTIFICATE

I, Thu Bui, CRR, RMR, Official Court Reporter, United States District Court, Northern District of Texas, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.

/s/ Thu Bui
Official Court Reporter